UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| JOHN SOLAK, on Behalf of Himself and All Others Similarly Situated, | § § § | |
| | § | Civil Action No. 3:17-cv-00020 |
| Plaintiff, | § § | |
| v. | § § | JURY TRIAL DEMAND |
| | § | |
| WESTERN REFINING, INC., PAUL L. FOSTER, JEFF A. STEVENS, SCOTT D. WEAVER, BRIAN J. HOGAN, L. FREDERICK FRANCIS, SIGMUND L. CORNELIUS, and ROBERT J. HASSLER, | § § § § § § § | |
| Defendants. | § § | |

## CLASS ACTION COMPLAINT

Plaintiff John Solak ("Plaintiff"), through his undersigned counsel, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

### NATURE OF THE ACTION

1.     This is a stockholder class action brought by Plaintiff on behalf of himself and the other public stockholders of Western Refining, Inc. ("Western" or the "Company") (other than Defendants outlined below) against the Company and its Board of Directors (the "Board" or "Individual Defendants") in connection with the November 16, 2016 entry by Western into a definitive merger agreement (the "Merger Agreement") with Tesoro Corporation ("Tesoro"), Tahoe Merger Sub 1, Inc. ("Merger Sub 1"), and Tahoe Merger Sub 2, LLC ("Merger Sub 2"). Pursuant to the Merger Agreement, the Company will become a wholly owned subsidiary of Tesoro (the "Proposed Transaction").  Plaintiff asserts claims against Western and the Individual Defendants for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934

(the "Exchange Act") (15 U.S.C. §§ 78n(a) and 78t(a), and United States Securities and Exchange Commission (the "SEC") Rule 14a-9).

2. Under the terms of the Merger Agreement, each share of Western's common stock will be converted into and become exchangeable for either (a) $37.30 in cash (the "cash consideration"), or (b) 0.4350 shares of common stock of Tesoro, (the "stock consideration") (collectively, the "Merger Consideration"). This Merger Consideration is inadequate and undervalues the Company. In particular, it fails to adequately value the Company's recent transformative acquisition of Northern Tier Energy LP. Unsurprisingly, the Merger Consideration represents a 20 percent discount over the Company's 52-week high of $46.65 per share, which was achieved on December 2, 2015, less than a year before the announcement of the Proposed Transaction.

3. The Proposed Transaction is further marred by a flawed, single-bidder process and conflicts of interests, not the least of which is that certain members of the Board and management have secured for themselves lucrative benefits not shared by non-insider shareholders, including substantial payouts and continued employment with the combined company. Moreover, for reasons discussed below, Western's financial advisor, Barclays Capital Inc. ("Barclays"), was also conflicted throughout the process that resulted in the Merger Agreement.

4. Finally, in order to convince Western's stockholders to vote in favor of the Proposed Transaction, the Individual Defendants authorized the filing of a Form S-4 Registration Statement with the SEC on or about December 14, 2016 (with its amendments, the "Registration Statement"), in violation of Sections 14(a) and 20(a) of the Exchange Act. The Registration Statement contains incomplete and materially misleading information regarding: (1) the process

that resulted in the Proposed Transaction, (ii) the financial analyses conducted by Barclays, and (iii) the projections used by Barclays in those analyses.

5.     For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Western stockholders before the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, recover damages resulting from Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder and Section 20(a) of the Exchange Act.

7.     Personal jurisdiction exists over each Defendant either because Defendant is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

8.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Western maintains its primary place of business in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

**A.** **Plaintiff**

9.      Plaintiff is, and at all relevant times was, a continuous shareholder of Western.

**B.** **Defendants**

10.     Defendant Western is a corporation organized and existing under the laws of the State of Delaware with its principal executive offices located at 123 West Mills Avenue, Suite 200, El Paso, Texas, 79901.

11.     Defendant Paul L. Foster ("Foster") has served as Chairman of the Company's Board since September 2005.  Defendant Foster served as the Company's Chief Executive Officer ("CEO") from September 2005 until January 2010, when he was appointed Executive Chairman of the Company.  Defendant Foster also served as President from September 2005 to February 2009.

12.     Defendant Jeff A. Stevens ("Stevens") has served as a director of the Company since September 2005, as the Company's President since February 2009, and as CEO since January 2010.  Defendant Stevens previously served as Chief Operating Officer since April 2008, as Executive Vice President of the Company since September 2005, and as Executive Vice President of one of the Company's affiliates since 2000.

13.     Defendant Scott D. Weaver ("Weaver") has served as a director of the Company and as one of its executive officers since September 2005.  Defendant Weaver currently serves as the Company's Vice President, Assistant Treasurer, and Assistant Secretary.

14.     Defendant Brian J. Hogan ("Hogan") has served as a director of the Company since January 2006.

15.     Defendant L. Frederick Francis ("Francis") has served as a director of the Company since February 2006.

16.     Defendant Sigmund L. Cornelius ("Cornelius") has served as a director of the Company since January 2012.

17.     Defendant Robert J. Hassler ("Hassler") has served as a director of the Company since November 2014.

18.     Defendants Foster, Stevens, Weaver, Hogan, Francis, Cornelius, and Hassler form the Board of Directors of Western and are collectively referred to herein as the "Board" or the "Individual Defendants."  Each of the Individual Defendants at all relevant times had the power to control and direct Western to engage in the misconduct alleged herein.

**C.      <u>Relevant Non-Parties</u>**

19.     Non-Party Tesoro Corporation ("Tesoro") is a Delaware corporation headquartered in San Antonio, Texas.

20.     Non-Party Tahoe Merger Sub 1, Inc. (previously defined as "Merger Sub 1") is a Delaware corporation and wholly owned subsidiary of Tesoro that was formed solely for purposes of effectuating the Proposed Transaction.

21.     Non-Party Tahoe Merger Sub 2, LLC (previously defined as "Merger Sub 2") is a Delaware limited liability company and wholly owned subsidiary of Tesoro.

**CLASS ACTION ALLEGATIONS**

22.     Plaintiff brings this Action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public stockholders of Western (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

23.     This action is properly maintainable as a class action.

24.     The Class is so numerous that joinder of all members is impracticable.  As of October 28, 2016, there were approximately 108,427,295 outstanding shares of Western common stock.  The actual number of public shareholders of Western will be ascertained through discovery.

25.     Questions of law and fact are common to the Class, including, among others:

a.      Whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the Registration Statement in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

b.      Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

c.      Whether Plaintiff and other members of the Class will suffer irreparable harm if the Proposed Transaction is consummated as presently anticipated.

26.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class, and Plaintiff has the same interests as the other members of the Class.  Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

27.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the

adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

28.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class.  Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

**A.     Corporate Background**

29.     Western is an independent crude oil refiner and marketer of refined products.  The Company operates through four segments: refining, Northern Tier Energy LP ("NTI"), Western Refining Logistics, LP ("WNRL"), and retail.  Operating primarily in the Southwest region of the U.S., Western's refineries have a crude oil refining capacity of 246,500 barrels per day.

30.     Tesoro is an independent petroleum refining and marketing company.  Tesoro operates through three business segments: Refining operating segment, which owns and operates refineries and refines crude oil and other feedstocks into transportation fuels; TLLP, a publicly traded limited partnership, which includes certain crude oil and natural gas gathering assets, natural gas processing and crude oil and refined products terminaling, and transportation and storage assets; and a marketing segment, which sells transportation fuels.  The company's refining segment owns and operates approximately six petroleum refineries with a combined crude oil capacity of over 850,000 barrels per day.

**B.     The Conflicted and Inadequate Process Leading to the Proposed Transaction**

31.     The process leading to the Proposed Transaction began just months after Western completed its acquisition of Northern Tier Energy LP (previously defined as "NTI"), an acquisition that was valued at approximately $1.4 billion and that, according to Defendant

Stevens, resulted "in a [C]ompany with three of the best-performing refineries on a gross-margin-per-barrel basis," a more "simplified corporate structure[,]" and greater access to capital. Despite the transformative nature of this acquisition, and before Western's stockholders could realize returns on the Company's investment in the NTI acquisition, the Individual Defendants oversaw a conflicted, single-bidder process that resulted in their securing lucrative insider benefits for themselves.

32.     Specifically, at a meeting over dinner on September 14, 2016, Gregory J. Goff, the Chairman, President and Chief Executive Officer ("CEO") of Tesoro ("Goff"), and Defendant Foster discussed a potential strategic transaction involving Tesoro and Western.  At this same dinner, and thus from the outset, Tesoro sought to rob Western of one of its long-time financial advisors, Goldman Sachs, by requesting that Western consent to Goldman Sachs serving as Tesoro's financial advisor in the potential acquisition, instead of Western's.

33.     Inexplicably – despite the fact that Goldman Sachs served as Western's financial advisor in connection with the Company's acquisition of NTI just months prior and, thus, had intimate knowledge of Western – during a September 22, 2016 Board meeting, the Western Board agreed to provide this consent.  At this same Board meeting, the Western Board also decided to appoint Defendants Foster, Weaver, and Stevens to engage with Tesoro regarding a potential sale.  Notably, though, Defendants Foster and Stevens will become directors of Tesoro after the consummation of the Proposed Transaction – the only two directors to receive this benefit – and all three Defendants have entered into voting agreements in favor of the Proposed Transaction.

34.     On September 30, 2016, Defendant Stevens spoke with representatives of Barclays regarding Western's possible engagement of Barclays to serve as its financial advisor –

despite that (upon information and belief) Barclays has a significant stake in the Company through its ownership of the Company's notes and stock and that Barclays has previously earned substantial fees from the seller in the Company's recent acquisition of NTI.  Following this discussion, and despite not having yet completed a potential conflicts assessment, Barclays began advising Western on the merits of a potential strategic transaction with Tesoro.  However, Barclays' was not formally engaged until November 11, 2016, well after, as noted below, the Board had already accepted its speculative opinion, based on a review of public information, that potential alternative transactions with certain unidentified parties were unlikely to provide superior value to Western's shareholders than that contemplated by the Proposed Transaction.

35.    At a teleconference on October 13, 2016, Barclays, Western's not-yet-formally-retained financial advisor, presented to senior management of Western their preliminary analysis of potential strategic transactions with Tesoro.  In addition, Barclays discussed various public and private companies in the industry that could be potential counterparties for Western in a strategic transaction, and relayed its view – which would go unchallenged through the execution of the Merger Agreement – that a transaction with any of those parties would be unlikely to offer greater value to Western stockholders.

36.    On October 31, 2016, the Tesoro board discussed the potential acquisition, including, among other things, "potential interloper risks related to the potential transaction."  In other words – and Barclays' speculation that no other buyer would be interested in Western aside – Tesoro, an actually potential buyer who was being advised by Western's former financial advisor, was specifically concerned that another buyer would in fact be interested and may even make a competing bid after a sale was announced.

37.     On November 2, 2016, representatives of Tesoro proposed an approximately 25% premium to Western's share price, with a consideration mix of 90% Tesoro stock and 10% cash. Tesoro also proposed that Western could appoint one person to the Tesoro board of directors and one director to TLLP, Tesoro's master limited partnership.

38.     On November 4, 2016, the Board held a teleconference with Western's senior management, Barclays, and its legal advisor.  Representatives of Barclays again relayed their speculative view that alternative transactions were unlikely to provide superior value to Western's shareholders as compared to the Proposed Transaction.  The Board thus determined to continue pursuing a strategic transaction only with Tesoro.  Thereafter, the Board authorized Defendant Foster to make a counter proposal to Tesoro that contemplated a 27.5% premium and that Western be permitted to designate two directors to the Tesoro board.

39.     Later on November 4, 2016, Defendant Foster and Mr. Geoff came to an agreement on price and agreed to propose that agreement to their respective boards.

40.     On November 7, 2016, Tesoro delivered voting and support agreements to be executed by each of Defendants Foster, Weaver, and Stevens, and by Franklin Mountain Investments LP, an affiliate of Defendant Foster.  Tesoro would ultimately secure these agreements.

41.     On November 8, 2016, **after the parties had already reached agreement on the Merger Consideration**, Barclays provided a presentation to the Board regarding its existing relationships with – and thus potential conflicts regarding – Western, Tesoro, and other relevant entities.

42.     On November 10, 2016, Goff confirmed to Defendant Foster that the Tesoro board was willing to offer two board seats to members of the Western Board.

43.     Also, on November 10, the Board held a teleconference with management, Barclays and its legal advisor. Defendant Foster updated the Board regarding the ongoing discussions with Tesoro.  In addition, the Board resolved to formally engage Barclays as its financial advisor – despite conflicts arising from Barclays' significant stake in the Company and prior engagement by the seller in the NTI acquisition.

44.     On November 16, 2016, the Board met to consider the Proposed Transaction. Despite not having conducted a pre-signing market check and failing to obtain a post-signing go-shop period to conduct a market check, the Board approved the Proposed Transaction and executed the Merger Agreement.

45.     Subsequently, Barclays identified a technical error in its analyses, as presented to the Board on November 16, 2016, and the Board held a special meeting on December 12, 2016, to review the error and a revised presentation.  The Board affirmed the Merger Agreement.

**C.     The Proposed Transaction**

46.     On November 17, 2016, Western and Tesoro issued a press release jointly announcing the Proposed Transaction, which provides in pertinent part:

**TESORO TO ACQUIRE WESTERN REFINING IN $6.4 BILLION TRANSACTION**

- Transaction creates a premier, highly integrated and geographically diversified refining, marketing and logistics company

- Stock transaction at exchange ratio of 0.4350, with option to elect cash in lieu of stock up to a cap of 10% of the equity consideration; values the transaction at $6.4 billion

- Commit to delivering $350 to $425 million in annual synergies; run rate to be achieved within the first two years

- Expects to achieve 10% to 13% EPS accretion in 2018, the first full year of combined operations

- Well positioned, highly reliable and advantaged refining system with over 1.1 million barrels per day of refining capacity with access to wide array of advantaged crude oil

- Creates leading multi-brand marketing and convenience store portfolio in growing geographies with over 3,000 combined branded retail stations

- Expands opportunities for logistics growth in crude oil production basins and product regions, particularly in the Permian basin

**SAN ANTONIO AND EL PASO, TEXAS – November 17, 2016** – Tesoro Corporation (NYSE: TSO) ("Tesoro") and Western Refining, Inc. (NYSE: WNR) ("Western") today jointly announced a definitive agreement under which Tesoro will acquire Western at an implied current price of $37.30 per Western share in a stock transaction, representing an equity value of $4.1 billion based on Tesoro's closing stock price of $85.74 on November 16, 2016. This represents an enterprise value of $6.4 billion, including the assumption of approximately $1.7 billion of Western's net debt and the $605 million market value of non-controlling interest in Western Refining Logistics, LP (NYSE: WNRL). This transaction has been unanimously approved by the boards of directors of both companies, and is another transformative step forward for Tesoro and the Company's ongoing commitment to creating significant value for shareholders, employees, communities and other key partners. The acquisition creates a premier, highly integrated and geographically diversified refining, marketing and logistics company and provides a strong platform for earnings growth and cash flow generation.

Under the terms of the agreement, Western shareholders can elect to receive 0.4350 shares of Tesoro for each share of Western stock they own, or $37.30 in cash per share of Western stock. Elections to receive cash will be subject to proration to the extent they exceed approximately 10.8 million shares (or approximately $404 million in the aggregate). Stock elections will not be subject to proration. The purchase price represents a premium of 22.3% to the closing price of Western's stock on the day prior to announcement, and a 31.6% premium to the volume weighted average price over the last 30 trading days. The transaction is expected to be tax-free to Western's shareholders who elect stock.

"The acquisition of Western further strengthens our integrated business model and extends our portfolio into attractive and growing markets," said Greg Goff, Chairman and CEO of Tesoro. "As a leading integrated refining, marketing and logistics company, this transformative acquisition drives value through a combination of access to advantaged crude oil, a strong, multi-brand marketing and convenience store portfolio and a robust platform for logistics growth, all of which will allow us to continue to create shareholder value."

"Also, our increased scale and diversity will enable us to leverage and enhance in-house technical capabilities, which we expect will result in cost efficiencies, the ability to drive more growth and increased productivity," Goff continued.

"This strategic combination provides our shareholders with the opportunity to participate in the tremendous future growth prospects and synergies of the combined company," said Paul Foster, Executive Chairman of Western Refining. "Joining forces with Tesoro, a company that shares our integrated business model strategy, will enable us to further leverage our capabilities in refining, marketing and logistics operations and allow our talented team to work on a growing number of exciting opportunities. We have tremendous respect for the Tesoro team and are excited to be a part of a larger and more diverse organization to support our continued growth."

**Strategic Rationale**

This transaction will enhance the integrated refining, marketing and logistics operations of both companies, creating a combined company that is well-positioned to drive significant growth across the value chain.

- **Top Tier Refining System:** Adds Western's refineries in Texas, New Mexico and Minnesota to Tesoro's existing refineries in California, Washington, Alaska, Utah and North Dakota, which will expand the combined company's operational capabilities and improve access to advantaged crude oil and extended product regions. Combined, the Company will have ten refineries, a refining capacity of over 1.1 million barrels per day and will benefit from Tesoro's and Western's proven track record of operational excellence.

- **Strong, Combined Multi-brand Marketing and Convenience Store Portfolio in Growing Geographies:** Brings together 12 premium and leading value retail and convenience store brands to better serve a broad customer base and regional preferences, and provides improved ratable supply from the entire refining system. The combined retail operations will comprise over 3,000 branded retail stations operating under a variety of brands including ARCO®, Shell®, Exxon®, Mobil®, SuperAmerica®, Giant and Tesoro®.

- **Expands Opportunities for Logistics Growth:** Leverages an extensive and complementary logistics network with access to advantaged crude oil basins. The logistics business will include ownership in two high-growth, independent Master Limited Partnerships – Tesoro Logistics LP and Western Refining Logistics, LP. Upon close of the transaction, Tesoro will own the general partner and be the largest unitholder in each MLP. Tesoro is committed to growing the value of the combined logistics portfolio and the current logistics growth strategy will be deployed across the expanded business. This strategy consists of: generating stable fee-based revenues; optimizing existing assets; pursuing high-return organic growth opportunities; growing through strategic acquisitions; and growing through the combined drop down inventory available to the two MLPs. Additionally, Tesoro expects to use the parent company's strong operating and execution capability to enhance the portfolio of opportunities in the high-growth Permian and other

attractive crude oil basins. This will include investments in crude oil gathering and storage, as well as natural gas gathering and processing.

- **Significant Shareholder Value Creation from Synergies:** Shareholders of both companies will benefit from $350 to $425 million in operational, commercial and corporate synergies. The Company expects to achieve the full run rate of these synergies within the first two years. The Company is confident in its ability to achieve these synergies given its solid track record of integrating operations and leveraging its integrated business model to deliver earnings growth through productivity, cost and system optimization benefits.

- **Strong Financial Position and Significant Cash Flow Enable Investments for Future Growth, Reducing Debt and Returning Cash to Shareholders:** The combined company is expected to deliver strong cash flows providing growth in shareholder value through investments in high-return capital projects, dividends and share repurchases. Upon closing, Tesoro will continue to have a strong balance sheet and credit metrics, and will remain on track for achieving an investment grade credit rating. The Company has increased its share repurchase authorization by $1.0 billion to over $2.0 billion in total. Tesoro expects to maintain its current quarterly dividend of $0.55 per share (or $2.20 per share annualized) after closing and is focused on growing dividends commensurate with the growth of the Company.

### Leadership

Upon closing, Greg Goff will continue to serve as Chairman, President and Chief Executive Officer of the combined company. Steven Sterin will continue to serve as Executive Vice President and Chief Financial Officer. Tesoro's Board of Directors is also expected to expand the size of the Board and name Western's current Executive Chairman, Paul Foster, and Western's current Chief Executive Officer, Jeff Stevens, as directors after closing of the transaction. The headquarters of Tesoro will remain in San Antonio, TX.

### Approvals and Timing

The transaction is expected to close in the first half of 2017 and is subject to customary closing conditions, including approval by the shareholders of both companies and the receipt of regulatory approval.

### Public Invitation to Conference Call and Webcast

Tesoro and Western will live broadcast a conference call at 7:30 a.m. CT (8:30 a.m. ET) today to discuss the transaction. Tesoro will also provide an update regarding its 2017 stand-alone outlook on the conference call. Interested parties may listen to the conference call and access accompanying presentation slides by logging on to http://www.tsocorp.com or http://www.wnr.com.

**Advisors**

Goldman, Sachs & Co. is serving as exclusive financial advisor to Tesoro and certain of its affiliates are providing committed financing. Sullivan & Cromwell LLP is serving as Tesoro's legal advisor for the transaction. Barclays is serving as exclusive financial advisor to Western and Davis Polk & Wardwell LLP is serving as its legal advisor.

**D.      The Proposed Transaction Does Not Provide Adequate Value to Shareholders.**

47.     As noted above, pursuant to the terms of the Merger Agreement, Western shareholders will receive the equivalent of approximately $37.30, either in cash or in shares of Tesoro, or some mix thereof, for each share of the Company that they own.

48.     As an initial matter, the Merger Consideration represents a 20 percent discount to the Company's 52-week high trading price of $46.65 per share.  In addition, the Merger Consideration amounts to just an 11 percent premium over the average analyst 12-month price target of $33.27.

49.     What is more, the Merger Consideration fails to adequately compensate Western shareholders for the Company's recent acquisition of NTI.  Indeed, the Tesoro Board specifically discussed Western Refining's "recent acquisitions" in its August 2, 2016 board meeting, at which it decided to approach Western about an acquisition.  What is more, in an article dated August 3, 2016, just two months after the closing of the NTI acquisition, SeekingAlpha.com reported that the Company's stock was "extremely undervalued":

> For me, the shares of WNR present an attractive trading opportunity. I see easy upside to $30 in the near term, offering a 50% return from the current share price. The $30 near-term price target is slightly below the midpoint of my estimate of the acceptable trading range for this company which accounts for the negative sentiment the company is experiencing at the present time. Over a longer period, I would expect shares to drift higher towards $40 in line with a mid-cycle P/E valuation and beyond that potentially higher to the $50 range once they have become fully valued.

**E.**     **The Merger Agreement Contains Onerous Deal Protection Devices.**

50.     The Proposed Transaction is also unfair because, as part of the Merger Agreement, the Board agreed to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and ensure that no successful competing offers will emerge for the Company.

51.     Despite the unfair price, the Merger Agreement has a number of provisions that make it more difficult for another buyer to purchase the Company, and for the Company to seek out competing offers.   Specifically, if the Company terminates the Proposed Transaction, the Merger Agreement states that the Company must pay Tesoro a $120,000,000 termination fee.

52.     Additionally, the Merger Agreement contains a strict no-solicitation provision, pursuant to which the Company is prohibited from soliciting competing acquisition proposals or, subject to certain exceptions regarding unsolicited proposals, engaging in discussions or providing information in connection with an alternative acquisition proposal.

53.     The Merger Agreement also contains an information rights provision that requires the Company to notify Tesoro of certain unsolicited competing offers and to provide Tesoro with information regarding such offers.   In addition, the Merger Agreement grants Tesoro recurring and unlimited matching rights, which provide it with access to confidential, non-public information about competing proposals from third parties that it can use to prepare a matching bid and four business days to negotiate with Western to amend the terms of the Merger Agreement and make a counter-offer in the event a superior offer is received.

54.     Moreover, as noted above, Defendants Foster, Stevens, and Weaver, who collectively own over 22.5 percent of Western's outstanding stock, entered into voting and support agreements that lock up their votes in favor of the Proposed Transaction

55.     These provisions and agreements will cumulatively discourage other potential bidders from making a competing bid for the Company.   Similarly, these provisions and agreements make it more difficult for the Company and individual shareholders to exercise their rights and to obtain a fair price for the Company's shares.

**F.      The Proposed Transaction Is the Result of a Conflicted Process**

56.     As noted above, in connection with the consummation of the Proposed Transaction, Defendants Foster and Stevens will become members of the Tesoro board. Unsurprisingly, and as also noted above, Defendants Foster (and his affiliated entities), Stevens, and Weaver also executed support agreements that collectively lock up 22.5% of the Company's stock in favor of the Proposed Transaction.   In addition to this, in connection with the consummation of the Proposed Transaction, all of the Individual Defendants' Restricted Stock Units will vest in full and be cashed out.   In connection with the Merger, Defendant Stevens is expected to receive more than $19 million alone.

57.     What is more, and as noted above, Barclays has a significant stake in the Company.   Further, Barclays has received $3.4 million in compensation from Western since January 2014, while it has received $9.7 million in compensation from Tesoro in the same time period.     Finally, and importantly, following the public announcement of the Proposed Transaction, Barclays was invited to participate in a $1.0 billion increase to Tesoro's existing $2.0 billion secured revolving credit facility.   Barclays was a participant in the existing facility and had received customary commitment fees in connection with the facility.   Barclays participated in the increase, for which it is expected to receive another $175,000 in fees from Tesoro.

**G.**     **Defendants Are Withholding Material Information from Shareholders.**

58.     Finally, on December 14, 2016, the Individual Defendants authorized the filing of the Registration Statement with the SEC in connection with the Proposed Transaction in order to convince Western's stockholders to vote in favor of the Merger. As discussed below and elsewhere herein, the Registration Statement omits and/or misrepresents material information that must be disclosed to Western's stockholders to enable them to render an informed decision with respect to the Proposed Transaction.

59.     First, the Registration Statement fails to fully and fairly disclose certain material information concerning the background of the Proposed Transaction. Specifically, the Registration Statement fails to adequately disclose how and why the Board and/or Barclays determined that a superior alternative transaction was unlikely. In light of the fact that the Board did not conduct a pre-singing market check, that the Merger Agreement does not provide for a post-signing market check, and that Tesoro was specifically concerned with potential "interlopers," this information is plainly material.

60.     Second, the Registration Statement fails to disclose material key inputs and assumptions underlying the analyses conducted by Barclays. Specifically, in connection with Barclays' *Discounted Cash Flow Analysis*, the Registration Statement fails to disclose the specific non-cash items Barclays used to adjust Western's after-tax unlevered free cash flows for 2017 through 2021. This is particularly material in light of the fact that the Company used a non-GAAP metric for free cash flows. This decision makes it almost impossible for shareholders to assess the free cash flow figures used or the analyses based on them, as companies can treat non-cash items differently in calculating non-GAAP financial measures like this. The materiality of this non-disclosure is highlighted by the fact that Goldman Sachs

conducted its analysis using unlevered free cash flows.  By failing to disclose precisely how Barclays adjusted Western's free cash flows, the Registration Statement is materially misleading and in violation of Rule 14a-9 and SEC Regulation G, 17 C.F.R. 244.100.[1]

61.   In connection with Barclays' *Selected Comparable Company Analysis*, the Registration Statement fails to disclose:

a.   the company specific EBITDA multiples used in the analysis; and

b.   a mean or a median EBITDA multiple of the selected companies.

62.   Finally, and similarly, in connection with Barclays' *Selected Precedent Transactions Analysis,* the Registration Statement fails to disclose:

---

[1]  SEC Regulation G has two requirements: (1) a general disclosure requirement and (2) a reconciliation requirement.  The general disclosure requirement prohibits "mak[ing] public a non- GAAP financial measure that, taken together with the information accompanying that measure, contains an untrue statement of a material fact or omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure ... not misleading."  17 C.F.R. § 244.100(b).  The reconciliation requirement requires an issuer that chooses to disclose a non- GAAP measure to provide a presentation of the "most directly comparable" GAAP measure, and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure. 17 C.F.R. § 244.100(a).

Indeed, in recent months, the SEC has specifically begun to crack down on the widespread use of such non-GAAP financial measures in shareholder communications because such measures lack consistent definitions and are often inherently misleading.  Mary Jo White, Chair of the SEC, specifically raised the issue in a June 27, 2016 keynote address, during which she stated:

> [O]ur rules governing these communications make clear that **the presentation of non-GAAP measures cannot be misleading and require that they be reconciled to the appropriate GAAP measure** so that investors and analysts can compare them to the one that is consistently defined under the GAAP requirements . . . .  In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation . . . .  [L]ast month, the staff issued guidance addressing a number of troublesome practices which can make non-GAAP disclosures misleading: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data.

*Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html.

      a.      the transaction specific EBITDA multiples used in the analysis; and

      b.      a mean or a median EBITDA multiple for the selected transactions.

63.    Without such information, Western's stockholders are unable to determine how the multiples used in determining Western's value compare to the other companies and transactions.

64.    The Registration Statement is materially incomplete and misleading because it omits the information identified above.  Defendants, separately and together, in connection with the Proposed Transaction are knowingly or recklessly violating their fiduciary duties, including their duties of loyalty and due care owed to Plaintiff and other public stockholders of Western.

## COUNT I

**On Behalf of Plaintiff and the Class Against
Western and the Individual Defendants for Violations of Section 14(a)
of the Securities Exchange Act of 1934 and Rule 14a-9 Promulgated Thereunder**

65.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

66.    Defendants have issued the Registration Statement with the intention of soliciting stockholder support for the Proposed Transaction.  Each Defendant reviewed and authorized the dissemination of the Registration Statement, which fails to provide critical information regarding, among other things, the process that led to the Proposed Transaction and the key inputs and assumptions of the financial analyses performed by Barclays in support of its fairness opinion.

67.    In so doing, Defendants made untrue statements of fact and omitted state material facts necessary to make the statements made not misleading.  Each of the Individual Defendants,

by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).

68.     SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

69.     During the relevant period, Defendants disseminated the false and misleading Registration Statement specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

70.     Specifically, and as detailed above, the Registration Statement violates Section 14(a) and Rule 14a-9 because it omits material facts concerning certain material information regarding the process leading up to the consummation of the Merger Agreement, key inputs and assumptions underlying Barclays' financial analyses, and the projections used by Barclays in those analyses.

71.     Moreover, in the exercise of reasonable care, the Individual Defendants knew or should have known that the Registration Statement is materially misleading and omits material facts that are necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the

Registration Statement states that Barclays reviewed its financial analyses with the Board and that the Board considered the financial analyses provided by Barclays in its fairness opinion. The Individual Defendants knew or should have known that the material information identified above has been omitted from the Registration Statement, rendering the sections of the Registration Statement identified above to be materially incomplete and misleading.

72.     The omissions and false and misleading statements in the Registration Statement are material in that a reasonable stockholder would consider them important in deciding how to vote on the Proposed Transaction.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to stockholders.

73.     By reason of the foregoing, Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9(a) promulgated thereunder.

74.     Unless Defendants are enjoined by the Court, they will continue to breach their duties owed to Plaintiff and the members of the Class, to the irreparable harm of the members of the Class.

75.     Because of the false and misleading statements in the Registration Statement, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate.  Therefore, injunctive relief is appropriate to ensure the Individual Defendants' misconduct is corrected.

## <u>COUNT II</u>

**On Behalf of Plaintiff and the Class Against the Individual Defendants**
**for Violations of Section 20(a) of the Securities Exchange Act of 1934**

76.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

77.     The Individual Defendants acted as controlling persons of Western within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Western, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Registration Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

78.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Registration Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

79.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The Registration Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of this document.

80.     In addition, as the Registration Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Registration Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

81.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

82.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Individual Defendants' conduct, Plaintiff will be irreparably harmed.

83.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.  Because of the false and misleading statements in the Registration Statement, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate.  Therefore, injunctive relief is appropriate to ensure the Individual Defendants' misconduct is corrected.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A.     Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representatives and Plaintiff's counsel as Class counsel;

B.     Enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Registration Statement;

C.     In the event that Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.      Directing Defendants to account to Plaintiff and the Class for damages sustained because of the wrongs complained of herein;

E.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

F.      Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

DATED:  January 19, 2017.

Respectfully submitted,


_____*/s/ Thomas E. Bilek*_____
Thomas E. Bilek
Texas Bar No. 02313525
**THE BILEK LAW FIRM, L.L.P.**
700 Louisiana, Suite 3950
Houston, TX  77002
(713) 227-7720
tbilek@bileklaw.com

***Counsel for Plaintiff***


**OF COUNSEL:**

Michael J. Palestina, Esq.
**KAHN SWICK & FOTI, LLC**
206 Covington Street
Madisonville, LA  70447
Tel.: (504) 455-1400
Fax: (504) 455-1498
E-mail: Michael.Palestina@ksfcounsel.com